# UNITED STATES DISTRICT COURT

__NORTHERN__ DISTRICT OF __ILLINOIS, EASTERN DIVISION__

UNITED STATES OF AMERICA

v.

KALVIN STEWART, aka "Bo Peep"

**FILED**
J N
OCT 11 2006
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

CRIMINAL COMPLAINT

MAGISTRATE JUDGE KEYS

CASE NUMBER: **06 CR 0737**

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about October 4, 2006 in __Kane__ County, in the __Northern__ District of __Illinois__, and elsewhere, defendant(s) did,

> distribute a controlled substance, namely, 50 grams or more of mixtures and substances containing cocaine base in the form of "crack cocaine," a Schedule II Narcotic Drug Controlled Substance,

in violation of Title __21__ United States Code, Section 841(a)(1).

I further state that I am a __Special Agent, Bureau of Alcohol, Tobacco, Firearms and Explosives__ and that this complaint is based on the following facts:

> See attached affidavit.

Continued on the attached sheet and made a part hereof: __x__ Yes ___ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

October 11, 2006
Date

at Chicago, Illinois
City and State

Hon. Arlander Keys, U.S. Magistrate Judge
Name & Title of Judicial Officer

_Arlander Keys_
Signature of Judicial Officer

STATE OF ILLINOIS )
) ss
COUNTY OF COOK )

# AFFIDAVIT

I, Mark A. Anton, being duly sworn under oath states as follows:

## INTRODUCTION

1. I am a Special Agent (S/A), U.S. Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), currently assigned to the Chicago Field Division's West Suburban Gang Violence Task Force, and have been so employed for seven years. Prior to working for ATF, I was employed for seven years as a state narcotics agent with the Wisconsin Department of Justice, Division of Narcotics Enforcement, assigned to the Milwaukee Field Office. I have received specialized training in the enforcement of the federal firearm and narcotics laws, including detailed instruction in the areas of drug identification, investigative techniques, criminal law, undercover operations, informant development and handling, physical and electronic surveillance, and the debriefing of defendants, witnesses, and informants. My training has also included instruction on the various methods and procedures utilized by drug organizations to illegally import, transport, and distribute controlled substances and listed chemicals used to manufacture controlled substances, as well as the methods drug organizations use to launder and conceal proceeds of their drug trafficking and protect these operations through intimidation and violence.

2. During the course of my career, I have been involved in several hundred investigations related to street gang organizations and their distribution of controlled substances, either as a case agent or in a supporting role. I am familiar with and have

participated in all of the normal methods of investigation, including, but not limited to, visual surveillance, the questioning of witnesses, the use of informants, undercover operations, the use of pen registers, and the interception of wire communications. I have debriefed numerous defendants, informants, and witnesses who have personal knowledge regarding drug trafficking organizations. As a result, I am familiar with the methods of operation of narcotics traffickers, including the distribution, storage, and transportation of narcotics, and the collection of the proceeds of narcotics trafficking and money laundering, in violation of Title 21, United States Code, Sections 841, 843, 846, 952, 960, 963, and Title 18, United States Code, Section 1956.

3. The information set forth in this affidavit is based on my own participation in this investigation, my review of documents and reports related to this investigation, and information conveyed to me by other local, state, and federal law enforcement officers. Because this affidavit is made for the limited purpose of establishing probable cause in support of the attached criminal complaint against Kalvin STEWART, AKA "Bo Peep", it does not contain everything that I know, or other law enforcement officers know, about Kalvin STEWART or the events described herein. The dialogue quoted in this affidavit is based on preliminary review of recorded conversations.

## CONFIDENTIAL INFORMANT

4. The confidential informant (hereinafter "CI") in this case had decided to cooperate with law enforcement for consideration toward a pending state drug charge and was then used in an undercover capacity in this investigation. The information contained herein that was obtained by this CI has been corroborated and cross-checked, where

possible, by tape recordings, surveillance, other investigations, and law enforcement computer systems and documents. Affiant and other law enforcement officers also have taken part in interviews, and analysis of information provided by the CI, and have corroborated information provided by the CI. The CI has admitted to being engaged in illegal criminal activities in the past before cooperating with law enforcement. A criminal history check indicates that the CI has four felony drug convictions dating from 1997, and one pending felony drug charge. He also appears to have been charged with a misdemeanor marijuana charge, but the criminal history report shows no disposition for that charge. In addition, information provided by the CI concerning other individuals within the drug trafficking organization of which STEWART is believed to be a part has been corroborated during the undercover operations through the use of electronic surveillance techniques, including both video and audio recordings of undercover meetings and transactions. Since July 2006, the CI has worked as a participatory CI during undercover operations with Aurora gang members involved in narcotics trafficking. The CI has made controlled purchases of both crack cocaine and powder cocaine.

## SEPTEMBER 22, 2006 CONTROLLED PURCHASE

5. On September 22, 2006, at 2:30 PM, ATF Task Force Officer (TFO) Greg Spayth and DEA TFO Alfredo Dean were conducting surveillance in the 900 block of Second Avenue, Aurora. Shortly thereafter, the CI contacted TFO Dean and stated that the CI had telephonic contact with Kalvin STEWART. The CI said STEWART was ready to sell the CI four and one half ounces of crack cocaine for $2,500.00.

6. At approximately 2:40 PM, TFO's Spayth and Dean observed STEWART standing in the driveway of 914 Second Avenue next to his green Oldsmobile Silhouette mini van, bearing IL license plate number 8144381. A subsequent registration check of IL/Reg 8144381 shows the car was registered to Individual A, at 833 Second Avenue, Aurora, IL. The surveillance was terminated so that law enforcement agents could meet with the CI at a predetermined location.

7. At approximately 3:16 PM that same day, TFO's Spayth and Dean met with the CI. TFO Spayth searched the CI for any contraband with negative results. TFO Dean then provided the CI with $2,500.00 in prerecorded USC to pay STEWART for four and one-half ounces of crack cocaine. TFO Spayth then provided the CI with audio and video electronic recording equipment that would enable the surveillance team to record the anticipated controlled buy. The CI was directed by agents to meet STEWART at 914 Second Avenue to purchase the four and one half ounces of crack cocaine, as agents had just surveilled STEWART at that location. The CI was followed by surveillance agents to 914 Second Avenue.

8. At approximately 3:29 PM, the CI arrived at 914 Second Avenue. The CI was surveilled exiting the CI's vehicle and entering STEWART's mini van. STEWART said to the CI "I only got like 46 left." The CI responded by saying "You say you only got like 46 left?" The CI asked STEWART, "What you want for that?" STEWART asked the CI, "You got the change with 'ya?" The CI replied, "Yeah." STEWART then told the CI, "Let me make a quick run." STEWART then told the CI, "Holler back at 'ya in 5 minutes." The CI

4

was surveilled exiting STEWART's mini van and returning to the CI's vehicle. Surveillance agents followed the CI from the area.

9. Only minutes after the CI had left 914 Second Avenue, TFO Spayth made telephonic contact with the CI. The CI stated that STEWART had told the CI that STEWART did not have the four and one half ounces of crack cocaine. According to the CI, STEWART told the CI that STEWART had fifty grams of crack cocaine but that he had to go and get it. According to the CI, STEWART told the CI to go and buy him a beer and that by the time the CI returned, STEWART would have the crack cocaine. Agents surveilled the CI driving a couple of blocks away to a business establishment.

10. At approximately 3:32 PM, TFO's Spayth and Dean observed STEWART drive his mini van from 914 Second Avenue to 833 Second Avenue. STEWART parked his mini van in the driveway and exited the van. Shortly thereafter, STEWART was observed reentering his mini van and driving back to 914 Second Avenue.

11. At approximately 3:39 PM, the CI arrived back at 914 Second Avenue. STEWART was observed as he entered the CI's vehicle. STEWART said to the CI, "It's that motherfucking Milky Way, boy." The CI responded "When you going to have the rest." STEWART replied, "Shit, I don't know. Probably tomorrow." The CI asked, "You going to hit me up?" STEWART replied, "Yeah, I got you." After what appeared to be the sound of money being counted, STEWART told the CI, "You owe me one more hundred. This is nine." The CI replied, "That's ten." The CI said, "Just let me know and shit." STEWART then said, "I'll call you." At approximately 3:40 PM, STEWART exited the CI's vehicle. The CI was followed out of the area back to the predetermined meet location.

5

12. Once at the meet location, the CI immediately handed TFO Dean a large plastic bag containing a tan, rock like substance suspected to be two ounces of crack cocaine. The CI also handed TFO Dean $1,500.00 that was remaining from the crack cocaine deal. TFO Spayth again searched the CI for contraband with negative results. TFO Spayth removed the electronics evidence from the CI. The CI told TFO's Dean and Spayth that the CI had purchased the two ounces of crack cocaine from Kalvin STEWART while inside the CI's vehicle. STEWART handed the CI the two ounces of suspected crack cocaine then the CI gave him $1,000.00. STEWART told the CI that he would have the additional two and one half ounces of crack cocaine for the CI either later that day or on the following day. STEWART told the CI he would call the CI once he had the crack cocaine.

13. TFO Dean subsequently processed and inventoried the narcotics and electronics evidence. The suspected narcotics were tested by the DEA's North Central Lab, and it tested positive for cocaine base, with a net weight of 44.1 grams, and it tested positive for the presence of sodium bicarbonate.

## OCTOBER 4, 2006 CONTROLLED PURCHASE

14. On October 4, 2006, at approximately 2:10 p.m., TFO Dean and TFO Spayth met with the CI. The CI had told officers that the CI had seen STEWART that morning in Aurora, and that STEWART had said that he was able to supply the CI with crack cocaine later that day. TFO Spayth searched the CI for any contraband with negative results. TFO Dean then provided the CI with $2,500.00 in prerecorded USC to pay STEWART for four and one-half ounces of crack cocaine. TFO Spayth then provided the CI with audio and

video electronic recording equipment that would enable the surveillance team to record the anticipated controlled buy. The CI was directed by agents to meet STEWART at 833 Second Avenue to purchase the four and a half ounce of crack cocaine. The CI was followed by surveillance agents to 833 Second Avenue. The CI was unable to make contact with STEWART at 833 Second Avenue, so the CI departed the area of 833 Second Avenue.

15. At approximately 2:39 p.m., the CI and STEWART met by mere coincidence in the area of a business establishment. The CI was still wearing the electronic recording device. The CI told STEWART that the CI was looking for "a split," which affiant knows from his experience to be a common street term for 4 ½ ounces of cocaine or crack cocaine. STEWART replied, "Meet me over by Leon's house, um, give me like ten minutes." The CI asked STEWART, "Will you do it like you did for me before?" which affiant understood to mean cook the cocaine into crack cocaine for the CI. STEWART replied, "Do you mean cook it up?" The CI replied, "Yeah, cook it up." STEWART answered, "Nah, I ain't got time." STEWART then told the CI that it would have to be later, and that he would call the CI when he, STEWART, was ready. The CI and STEWART each departed the area.

16. At approximately 2:40 p.m., TFO Dean, TFO Spayth, and SA Balkema observed STEWART drive onto the driveway of 833 Second Avenue in his Oldsmobile Silhouette. STEWART exited the vehicle and entered the residence.

17. At approximately 3:06 p.m., the CI received a telephone call in the presence of affiant. The CI related to affiant that it was STEWART who had called, and that

STEWART had informed the CI that STEWART was ready. At approximately 3:13 p.m., STEWART was surveilled exiting 833 Second Avenue and driving directly to 914 Second Avenue. STEWART parked in the driveway of 914 Second Avenue and remained in the vehicle. At approximately 3:15 p.m., the CI was surveilled arriving at 914 Second Avenue. The CI and STEWART met inside the CI's vehicle. According to the CI, STEWART removed from his pocket a clear plastic baggie containing what he believed to be 4 ½ ounces of crack cocaine, and he placed the baggie in the area of the gear shifter of the CI's vehicle. According to the CI, the CI gave STEWART $2,500.00 of pre-recorded official advanced funds, and STEWART placed the money into his (STEWART's) pant pocket.

18. On October 4, 2006, at approximately 3:16 p.m., the CI was surveilled backing out of the driveway of 914 Second Avenue. STEWART walked down the driveway of 914 Second Avenue but did not enter the residence. At approximately 3:17 p.m., STEWART entered his vehicle and departed the area.

19. The CI was surveilled driving back to a pre-determined location, with only a short break in surveillance, where SA Anton met with the CI. The CI gave SA Anton a plastic bag containing a tan, rock-like substance suspected to be crack cocaine. SA Anton relinquished the substance to TFO Dean. TFO Dean subsequently processed and inventoried the substance and the electronics evidence. The substance was field-tested with a "NIK Scott Reagent" cocaine HCL/cocaine base test kit, and it tested positive for cocaine base. Based on affiant's experience, the cocaine base was of the type commonly known as "crack cocaine," as it was tan in color and rock-like. The crack cocaine was weighed and was found to have a gross weight of approximately 120 grams.

_____
Mark A. Anton, Special Agent, ATF

Sworn to and subscribed to before me on this 11th day of October 2006.

_____
ARLANDER KEYS
UNITED STATES MAGISTRATE JUDGE

9